ROBERT H. McCORMICK ET AL.

v.

JOHN W. NICHOLS ET AL.

1. GAMBLING CONTRACTS—APPLICATION OF PAYMENTS.—In a suit for balance due upon a series of transactions, some of which w re gambling contracts and void under the statute, where the payments made amount to more than all the items that were legal or recoverable, the defendants would be entitled to have their payments applied first to the charges that were legitimate, and to repudiate so much of the balance as remained unpaid.

2. SAME—FUTURE DELIVERY.—A contract for future delivery does not fall under the condemnation of the statute, unless the parties on both sides intend it to be settled by payment of the difference between the price agreed on and the market value at the time appointed for delivery, without actual delivery.

3. SAME—AGENT AND PRINCIPAL.—A contract made by an agent, if a gambling one, is absolutely void as against the principal, and can not be validated by any form of authorization or ratification; and if not a gambling contract, and yet not authorized because in departure from the order given, the principal will not be bound by a ratification unless with knowledge or information of such departure.

APPEAL from the Circuit Court of DeWitt county; the Hon. LYMAN LACEY, Judge, presiding. Opinion filed February 25, 1886.

Messrs. MOORE & WARNER, for appellants; as to "options," cited Logan v. Musick, 81 Ill. 415; Pixley v. Boynton, 79 Ill. 351; Cole v. Milmine, 88 Ill. 349; Wolcott v. Health, 78 Ill. 433; Corbett v. Underwood, 83 Ill. 324; Porter v. Viets, 1 Biss. 177; Clark v. Foss, 7 Biss. 541; Gilbert v. Gaugar, 8 Biss. 214.

Mr. GEORGE B. GRAHAM, for appellees.

PLEASANTS, J. This was an action of assumpsit on the common counts, by appellants, who were commission merchants at Chicago, to recover a balance of $643.69, claimed to be due for commissions and advances to pay losses on deals made by

them for and at the request of appellees, on the Board of Trade. Besides the general issue two special pleas were filed, setting up that the consideration for the promises declared on was money won by plaintiffs from defendants by gaming, to wit, by buying and selling deals and options in grain which were to be settled upon differences alone, and wherein neither party was to deliver or receive any article so bought or sold, of which plaintiff had notice; wherefore, by force of the statute, such promises were void. Issues were joined on replications traversing the alleged consideration, and the trial resulted in a verdict for defendants; upon which, after motion for a new trial overruled, judgment was entered and the plaintiffs appealed.

In the spring of 1883 appellees were partners in the hardware and grain business at Parnell, a small railroad station in the county of DeWitt. They bought of farmers in the neighborhood and shipped to appellants for sale by them at Chicago. After a short course of such dealing they gave orders to appellees from time to time from May 31st to October following, for purchases and sales on the Board of Trade unconnected with actual shipments; and it is in reference to the charges upon these transactions that this controversy has arisen.

It appears that the account between the parties, as kept by appellants, was never closed—the balance ranging in round numbers from $500 to $1,000, being always against appellees—and that the credits were all entered as applying generally, no specific direction in relation to them having been given.

Appellees claim that the balance sued for is less than the charges upon transactions that were void, as alleged in the special pleas; in other words, that the payments made amount to more than all the items that were legal or recoverable. In such case they would be entitled to have their payments applied first to the charges that were legitimate, and repudiate so much of the balance as remains unpaid.

The charges for commissions and advances on the deal of May 31st, being the first of the series alleged to be tainted, exceed the sum in controversy by over $200. If, then, that was a gambling transaction, the verdict was right, whatever may have been the character of the others.

McCormick v. Nichols.

Mr. Nichols, one of the appellees, testified in relation to the inception of that deal, that, being on that day in Chicago, and for the first time on the floor of the Board of Trade, he there met and had a conversation with Mr. Hade, a salesman of appellants, which he related as follows: "He wanted to know why we had not been trading with them. He was an old acquaintance of ours before he went in with that firm. He told us that we ought to trade with them; that McCormick was one of the reaper company, and that they were all well off and well fixed to take care of a customer in case they needed it, and anyhow for us to take a scalp to make expenses. My understanding of a scalp is, it is a trade for the day, and sold out that evening or the next day; it is a short trade. Q. Does that mean or intend the delivery of grain, or a settlement on differences? A. It is a settlement on differences. He was saying he had a very good opinion of wheat; that he had information that wheat was in a bad condition and was going up, and if we would take a five or ten thousand bushel wheat scalp that on that we would make our expenses, and that perhaps we would hold on a day or two and it would close at any rate before we went home; but we might let it run longer if we saw fit. We told him to go and buy ten thousand bushels for us."

Mr. North, his partner, corroborated him, and both say it was their understanding and intention that the deal was to be settled upon differences alone. Mr. Ludington testified: "I have been in the grain business ten or twelve years. As I understand it, a scalp is where we buy in the morning and close it out that night; it is a short deal, a quick sale and a settlement on differences. If a man goes in and buys at a regular sale with the intention of cleaning out that day, or within a day or so, I should consider that a scalp; but if he buys for May and holds on until the May delivery, that would not be a scalp; a short deal is what I call a scalp."

Mr. Hade was not called as a witness, nor was any attempt made to contradict this testimony of appellees, or to show a different understanding of the term "scalp," though Mr. Beebe himself and several other members of the Board of Trade testified on behalf of appellants.

The deal was made on May 31st, but not closed out until June 18th, when appellants sold, without orders, at a loss of $850.

A contract for future delivery does not fall under condemnation of the statute unless the parties on both sides intend it to be settled by payment of the difference between the price agreed on and the market value at the time appointed for delivery, without actual delivery; and in reference to the one mentioned, as also to all the others made, appellants say there is no evidence of such intention on the part of the other parties.

It may be true that nothing in this record would be competent evidence of it as against them. But it was not so offered, and its competency as such is not the question before us. Was it competent—did it raise a presumption—as against appellants, which they were called on to rebut? As between themselves and the other contracting parties they were the purchasers; but as to appellees, they were their agents or brokers, and appellees the real purchasers. If, as such agents, they were directed to make the deal to be settled upon such difference alone, and did make the deal, the presumption would be, as against them, that they made it as directed; that is, to be so settled. Beveridge v. Hewitt, 8 Bradwell, 482–3.

And if they did not so make it, how can they claim that what they did and advanced was at the instance and request of appellees, as was required in order to establish a cause of action against the plea of the general issue? The unlawfulness of the deal they were ordered to make would have justified their declining, even after agreeing, to make it; but such an order would not authorize them to make one of a different character, and there is no evidence of its ratification by appellees with knowledge or information that it was of a different character from that ordered.

Whatever, then, may have been the intention of the parties respecting the mode of settlement, the evidence referred to was competent and cogent, either under the general issue or under the special pleas, and if upon this evidence the jury found the arrangement with Hade was for a deal to be settled

upon the "difference" alone, no good reason is perceived for disturbing their verdict. By bringing this suit appellants adopted or recognized it as their own, and though personally ignorant of its character at the time, must take it as it really was. Being found to have been such as is forbidden by the statute, and their charges on account of it being in excess of the balance here claimed, they were not entitled to recover. Tenney v. Foote, 95 Ill. 99. It is therefore unnecessary to consider the other items embraced in the account sued on.

Of the instructions given for appellants those numbered 2, 5, 10, 12 and 13, as asked, entirely ignored the defense developed by the evidence and their modification was required to correct this defect. In our opinion these did not, as suggested, misstate the rule as to the burden of proof.

Eight were refused. The legal proposition presented by the first and second of these is that "if the defendants authorized or ratified the settlements and payments (in question) then they are liable to the plaintiffs in this action for the same, and this regardless of whether said transactions were gambling contracts on the board within the meaning of the statute or not." If gambling contracts, they were absolutely void, and could not be validated by any form of authorization or ratification; if they were not, and yet were not authorized because in departure from the orders given, the defendant would not be bound by a ratification unless with knowledge or information of such departure, of which there is no evidence.

The second incorrectly stated that no proof had been introduced in support of the special pleas. The third instructed the jury that the defense imputed a crime and therefore every fact necessary to constitute it must be "clearly proven by a preponderance of the evidence." But a criminal offense was not necessarily, nor in fact, imputed to the plaintiffs, and we hold that as against them it was sufficient to prove a gambling contract with their agent by the measure of evidence generally required in civil actions. If the facts were to be "clearly" proven, the jury should have been told how clearly. The proposition as stated was too indefinite and liable to mislead.

No harm was done by the refusal of the fourth, which related to interest, because nothing was found due for principal.

The fifth was substantially embodied in the one numbered six as given, and the seventh and eighth were contrary to the construction of the statute in Pierce v. Foote, 114 Ill. 228, according to which plaintiffs were " winners."

Complaint is also made of the overruling of certain challenges for cause, whereby it is claimed appellants were wrongfully forced to exhaust their peremptory challeng's, and take one juror who was disqualified by prejudice. To our minds it is clear that these jurors meant to say they had an opinion that there were gaming transactions on the Board of Trade, and not as the improper frame of the question would make it literally appear, that transactions on the board were gaming; and if it would require evidence or even a preponder_ance of evidence to change that opinion (which was the cause alleged) we apprehend they were not at all singular in that respect nor thereby disqualified to try this case, as to which they said in substance they had no knowledge, opinion or prejudice, and could try it impartially upon the evidence therein. Counsel especially except to the court's sustaining an objection to the following question: " If the evidence in this case is equally balanced on the question as to whether the contracts in controversy were gambling contracts, would you adhere to your original opinion ? "

This assumed that the juror had an original opinion in this case and of the contracts here in controversy, which was entirely without foundation, so far as we can discover. Bes'des, it admitted of no intelligent categorical answer, because it supposed no question of any fact that would make these gambling contracts.

For these reasons the objection was rightly sustained.

Perceiving no material error in this record · the judgment will be affirmed.

Affirmed.